# EXHIBIT 1

**ORIGINAL
NEGOTIABLE**

"KOCSSD2803101"

# SOMO
## BASRAH OIL TERMINAL

### BILL OF LADING
### BBL/5635

Shipped in apparent good order and condition by   **(SOMO)**   in the S/S - M / T called the

**SAMHO DREAM**                             Whereof CPT.                **GIM  SEONG GYU**

is Master for this present voyage now lying at the Port of   BASRAH OIL TERMINAL

### IRAQ CRUDE OIL(BASRAH LIGHT ) IN BULK

|         | Cubic Meters | U.S. Barrels | Long Tons  | Metric Tons |
|---------|--------------|--------------|------------|-------------|
| GROSS : | 330,203.439  | 2,076,921    | 282,170.49 | 286,699.326 |
| NET   : | 329,955.737  | 2,075,363    | 281,927.21 | 286,452.141 |

and to be delivered ( subject to under mentioned conditions and exceptions ) in like good order
and condition at the Port of   **U.S. GULF COAST**                                            or as near
thereto as she may safely get(always afloat)unto order
**"VALERO MARKETING AND SUPPLY COMPANY"**
or to their assigns upon payment of freight as per charter party , all conditions and exceptions of
which charter party , including the negligence clause , are deemed to be incorporated in this Bill
of Lading .
    The ship has liberty before or after proceeding on the voyage to proceed to and stay at
any port or ports in any order for any purpose and not withstanding that same may be out of
the direct route to the port of discharge, with liberty to sail without pilots , and to tow or be
towed and to tow and assist vessels in distress or otherwise in all positions, and to deviate for
the purpose of saving life or property .
In witness whereof the Master of the said ship has affirmed to          **THREE**          Bills
of Lading, all of this tenor and date, one of which being accomplished others to stand void .

    "CLEAN ON BOARD"
    "FREIGHT PAYABLE BY BUYER AS  ARRANGED"

Dated at   BASRAH OIL  TERMINAL          TWENTY EIGHTH       **day of**    MARCH, 2010

Master

DUPLICATE
NEGOTIABLE

"KOCSSD2803101"

# SOMO
### BASRAH OIL TERMINAL

### BILL OF LADING
### BBL/5635

Shipped in apparent good order and condition by   (**SOMO**)   in the S/S - M / T called the

**SAMHO DREAM**               Whereof CPT.        **GIM  SEONG GYU**

is Master for this present voyage now lying at the Port of   BASRAH OIL TERMINAL

### IRAQ CRUDE OIL(BASRAH LIGHT ) IN BULK

|  | Cubic Meters | U.S. Barrels | Long Tons | Metric Tons |
|---|---|---|---|---|
| **GROSS :** | 330,203.439 | 2,076,921 | 282,170.49 | 286,699.326 |
| **NET :** | 329,955.737 | 2,075,363 | 281,927.21 | 286,452.141 |

and to be delivered ( subject to under mentioned  conditions  and  exceptions ) in like good order
and condition at the Port of    **U.S. GULF COAST**                                             or as near
thereto as she may safely get(always afloat)unto order
**"VALERO MARKETING AND SUPPLY COMPANY"**
or to their assigns upon payment  of freight as per charter party ,  all conditions  and  exceptions of
which  charter party , including the negligence clause , are deemed  to  be  incorporated  in  this Bill
of Lading .
        The ship has liberty before or after proceeding  on  the  voyage  to  proceed to and stay at
any port or ports in any order for any purpose and not withstanding that same may be out of
the direct route to the port of discharge, with liberty to sail without pilots , and to tow or be
towed  and  to tow  and  assist  vessels in distress or otherwise in all positions,  and to deviate for
the purpose of saving life or property .
In witness whereof the Master of the said ship has affirmed to        **THREE**           Bills
of Lading, all of  this  tenor  and date, one of which being accomplished others to stand void .

"CLEAN ON BOARD"
"FREIGHT PAYABLE BY BUYER AS  ARRANGED"

Dated at    BASRAH OIL  TERMINAL            TWENTY EIGHTH        day of      MARCH, 2010

Master

TRIPLICATE
NEGOTIABLE

"KOCSSD2803101"

# SOMO
### BASRAH OIL TERMINAL

## BILL OF LADING
### BBL/5635

Shipped in apparent good order and condition by   **(SOMO)**   in the S/S - M / T called the

**SAMHO DREAM**                    Whereof  CPT            **GIM  SEONG GYU**

is Master for this present voyage now lying at the Port of   BASRAH OIL TERMINAL

### IRAQ CRUDE OIL(BASRAH LIGHT ) IN BULK

|  | Cubic Meters | U.S. Barrels | Long Tons | Metric Tons |
|---|---|---|---|---|
| **GROSS :** | 330,203.439 | 2,076,921 | 282,170.49 | 286,699.326 |
| **NET    :** | 329,955.737 | 2,075,363 | 281,927.21 | 286,452.141 |

and to be delivered ( subject  to  under  mentioned  conditions  and  exceptions )  in  like  good  order
and condition at the Port of       **U.S. GULF COAST**                                               or as near
thereto as she may safely get(always afloat)unto order
**"VALERO MARKETING AND SUPPLY COMPANY"**
or to their assigns upon payment  of freight as  per charter party ,  all conditions  and  exceptions of
which  charter party , including the negligence clause ,  are deemed to  be  incorporated  in  this  Bill
of Lading
        The  ship  has  liberty  before  or  after  proceeding  on  the  voyage  to  proceed  to  and  stay  at
any  port  or  ports  in  any  order  for  any  purpose  and  not  withstanding  that  same  may  be  out  of
the  direct  route  to  the  port  of  discharge,  with  liberty  to  sail  without  pilots ,  and  to  tow  or  be
towed  and  to  tow  and  assist  vessels  in  distress  or  otherwise  in  all  positions,  and  to  deviate  for
the  purpose  of  saving  life  or  property
In  witness  whereof  the  Master  of  the  said  ship  has  affirmed  to            **THREE**            Bills
of  Lading, all  of  this  tenor  and date, one of which  being accomplished others to stand void

"CLEAN ON BOARD"
"FREIGHT PAYABLE BY BUYER AS  ARRANGED"

Dated at   BASRAH OIL  TERMINAL              TWENTY EIGHTH         day of    MARCH  2010

Master

# EXHIBIT 2

**Barlotta, Lynn (NYC - X73301)**

| | |
|---|---|
| **From:** | Honan, Bill (NYC - X73300) |
| **Sent:** | Thursday, July 29, 2010 9:32 AM |
| **To:** | 'Jim Textor' |
| **Subject:** | Samho Dream - Our File 352735-00047 |

We have been requested by our client to pass this letter to Koch Shipping Inc.

To:  James M. Textor, Esq.

Dear Sirs:

**'Samho Dream'**
**Declaration of General Average**
------------------------------------------------------------

As a consequence of the seizure of the vessel by the pirates, the ship, crew and cargo were in a position of peril and the payment of ransom will be necessary in order to secure their release for the common safety. These circumstances give rise to a claim for general average. In addition to the ransom, owners have incurred and will continue to incur many other additional expenses related to the ransom such as the negotiators' fees, the costs of insuring and handling the ransom payment and legal costs. Owners wish to pursue payment by the time charterers and the cargo interests of their contribution to these losses and accordingly owners hereby formally declare general average.

Owners have instructed Richards Hogg Lindley (RHL) to prepare the general average adjustment in order to determine the amount which should be paid by each contributing interest.

Please forward this message to the voyage charterers and cargo interests for their guidance and we should be grateful if all concerned would provide RHL in due course with any documents / information they require to prepare the adjustment.

The foregoing is stated without prejudice to owners' position that Clause 4 of the time charter requires the time charterers to pay (or reimburse the owners for) all additional costs, as that term is used in Clause 4 of the time charter, including the ransom.

Kindly acknowledge safe receipt of this message.

Best regards,
INCHUL SHIN
Samho Shipping Co., Ltd.


Regards,


7/29/2010

# EXHIBIT 3

*Execution Copy*

## AGREEMENT FOR STS OPERATION AND RELEASE
## OF THE M/V SAMHO DREAM

SH Tankers Limited as the Registered Owner ("Registered Owner") of the M/V SAMHO DREAM (the "Vessel"), Koch Shipping Inc. ("Koch Shipping") as the Time Charterer/Disponent Owner of the Vessel and  Valero Marketing & Supply Company ("Valero") as the Voyage Charterer of the Vessel and the consignee of a cargo of 2,076,921 barrels of Iraq Crude Oil (Basrah Light) in Bulk ("the Cargo") as loaded on the Vessel, hereby agree to  a Ship-to-Ship Cargo transfer ("STS") operation at Fujairah with certain agreed conditions as follows:

1. On February 25, 2010, SH Tankers Limited as the Registered Owner of the M/V SAMHO DREAM and Koch Shipping as the Time Charterer entered into a time charter party contract on an amended SHELLTIME 4 form (the "Time Charter").

2. On March 8, 2010, Koch Shipping as the Disponent Owner of the Vessel and Valero  as the Voyage Charterer entered into a voyage charter party contract on an amended EXXONMOBILVOY 2005 form (the "Voyage Charter").

3. The Time Charter and the Voyage Charter contain New York arbitration clauses.

4. On March 9, 2010, pursuant to the Voyage Charter, Valero issued voyage orders to Koch Shipping as Disponent Owner, which it conveyed to the Registered Owner, for the Vessel to load the Cargo at Basrah, Iraq for discharge at the Galveston, Texas offshore lighterage area ("Galveston").

5. On March 28, 2010, the Vessel loaded the Cargo at Basrah and the Master issued three original copies of the bill of lading no. 5635, dated March 28, 2010, to the

1

order of Valero ("Bill or Lading"). Valero warrants that it is the lawful holder of the Bill of Lading and entitled to delivery of the cargo.

6.    On March 31, 2010, the Vessel called Fujairah to allow Koch Shipping to load a bunker stem.

7.    On April 4, 2010, while en route from Basrah to Galveston, the Vessel was seized by Somali pirates.

8.    On May 18, 2010 the Registered Owner interests, commenced New York arbitration proceedings pursuant to Time Charter Rider Clause No. 68. As of June 2, 2010, the Registered Owner and Koch Shipping have appointed a full Panel and attended the first arbitration hearing on June 8, 2010. The Panel issued a stay of the arbitration proceedings pending the payment of the ransom.

9.    On or about July 29, 2010, the Registered Owner declared general average arising out of the Vessel's seizure by Somali pirates ("General Average"). On or about November 6, 2010, the Registered Owner arranged for payment of the ransom to the pirates.

10.    From April 4 through November 6, 2010, the Vessel remained under the control of the pirates.

11.    On or about November 10, 2010, the Vessel arrived at Salalah, Oman as the Port of Refuge.

12.    As the ransom was paid, the stay of the arbitration proceedings between Owner and Koch Shipping has been lifted.

13.    Koch Shipping has requested Valero to permit the Vessel to return to Fujairah, at which port there will be a STS operation of the Cargo to a replacement vessel,

chartered by Koch Shipping, for on carriage pursuant to the terms of the Voyage Charter.

In consideration of the Time Charter, the Voyage Charter, the Bill of Lading and the referenced events, following payment by the Registered Owner of the ransom to the pirates and release of the Vessel to Koch Shipping's commercial control pursuant to the Time Charter, Koch Shipping, with the consent of the other parties, will order the Vessel to Fujairah to conduct a STS operation to deliver the Cargo under the Bill of Lading on the following terms and conditions:

**Commercial Issues**

A.    Valero as Voyage Charterer will cancel its original voyage orders under the Voyage Charter and issue amended orders for the Vessel to proceed to Fujairah, which amended orders are endorsed by Valero such that the said voyage does not constitute a deviation under the Bill of Lading or the Voyage Charter. Koch Shipping as Time Charterer shall (pass on) the said amended orders to the Registered Owner.

B.    Koch Shipping's execution of this Agreement constitutes its Delivery Request pursuant to Clause 70(e)(ii) of the Time Charter.

C.    Before commencement of the STS operation:-

i.    Valero shall (a) surrender the three original copies of the Bill of Lading and issue a letter of indemnity to the Registered Owner in return for discharge and delivery at a place other than that stated in the Bill of Lading in the form annexed as Attachment A; or (b) should Valero be unable to surrender the three original copies of the Bill of Lading to the Registered Owner prior to commencement of the STS operation, issue a letter of indemnity to the Registered Owner in return for delivery of the Cargo at a port other than that

3

stated in the Bill of Lading and without production of the three original Bills of Lading in the form annexed as Attachment B;

ii.   Valero also shall (a) issue a letter of indemnity to Koch Shipping in return for discharge and delivery at a place other than that stated in the Bill of Lading in accordance with the Voyage Charter Clause 27 (f) in the form annexed as Attachment C; or (b) should Valero be unable to surrender the three original copies of the Bill of Lading to the Registered Owner prior to commencement of the STS operation, issue a letter of indemnity to Koch Shipping in return for delivery of the Cargo at a port other than that stated in the Bill of Lading and without production of the three original copies of the Bill of Lading in the form annexed as Attachment D.

iii.  Koch Shipping shall (a) issue a letter of indemnity to the Registered Owner in return for discharge and delivery at a place other than that stated in the Bill of Lading in accordance with Time Charter Clause 70 (f) in the form annexed as Attachment E; or (b) should Valero be unable to surrender the three original copies of the Bill of Lading to the Registered Owner prior to commencement of the STS operation, issue a letter of indemnity to the Registered Owner in return for delivery of the Cargo at a port other than that stated in the Bill of Lading and without production of the three original copies of the Bill of Lading in the form annexed as Attachment. F.

D.   Pursuant to Time Charter Clause No. 22(a), Koch Shipping will continue to pay hire to the Registered Owner until such time as the hoses are disconnected at the completion of the

4

STS operation at Fujairah. Koch Shipping's agreement to continue to pay the hire is strictly without prejudice to its rights under the Time Charter including but not limited to Rider Clause No. 76.

E.   To satisfy its performance as Disponent Owner under the Voyage Charter, Koch Shipping will charter in a suitable replacement vessel, with standard ISPS tanker charter party terms and conditions (including but not limited to appropriate compliance clauses to incorporate the New York Declaration for anti-piracy and the Best Management Practices ("BMP") Revision No. 3, dated June, 2010) for the completion of the voyage to Galveston and/or any other discharge location permitted by the Voyage Charter, as declared by Valero.

F.   The Registered Owner agrees to use its best efforts to provide available documents or information concerning the Vessel to Koch Shipping that the owner(s) or operators of potential replacement vessels reasonably and customarily request in assessing whether to charter vessels to Koch Shipping.

G.   Prior to lifting subjects, Valero will be given an opportunity to vet for both vessel suitability and security and approve or reject the replacement vessel. Without limitation, Valero will be provided by Koch Shipping with the following in order for it to make a vetting assessment (1) voyage routing, (2) Ship Security Plan (SSP) and anti-piracy procedures required by ISPS, and (3) owner/operator plan to ensure safe STS operation.

H.   To satisfy its performance as Disponent Owner under the Voyage Charter, Koch Shipping will arrange with the Owner of the replacement vessel to issue a bill of lading in standard form to the order of Valero.

I.   Subject to Clause W below, at its sole risk and expense, Koch Shipping (or an affiliate) will arrange for the STS support services by an experienced STS support company and will

conduct a STS operation in accordance with the latest edition of the OCIMF rules and regulations for offshore lighterage operations. Koch Shipping will pay for all STS support service charges. Koch Shipping agrees to defend, indemnify and hold Valero and its interested cargo underwriters (collectively "Valero Interests") harmless from any vessel delays or demurrage, loss (including but not limited to total loss or constructive total loss) or contamination of cargo, General Average, and related costs and expenses arising out of or in connection with the voyage to Fujairah and the STS operation, including but not limited to all associated activities involving the STS operation, except to the extent caused by Valero or its employees, agents, contractors or representatives.

J.     Upon completion of the STS operation and disconnection of the hoses, pursuant to Time Charter Clause No. 22(a), the Vessel is to be released to the Registered Owner under the Time Charter, to permit the Vessel to proceed to a shipyard.

K.     Valero shall not be liable under the Voyage Charter for steaming costs for the voyage from the location of captivity on April 4, 2010 to Fujairah and for the completion of the onward voyage from Fujairah to the U.S. Gulf.  The Worldscale Flat rate used in calculating Valero's freight under the Voyage Charter will only include the load port of Basrah and ultimate lightering location in the U.S. Gulf.

L.     The performance of the STS operation at Fujairah, and the transfer of the Cargo to the replacement vessel, does not trigger any freight or other payment by Valero under the Voyage Charter.

M.     For the performance of the Voyage Charter, the Valero freight obligation will be due and payable upon delivery of the Cargo at the specified destination in the U.S. Gulf.

6

N.     Koch Shipping and Valero agree that any laytime calculations required under the Voyage Charter will only include time used during the original loading in Basrah and at the ultimate discharge point in the U.S. Gulf.  No other time from the original loading in Basrah until the ultimate discharge in the U. S. Gulf will count as used laytime or time on demurrage.

**Operational Issues**

O.     For the voyage from Salalah to Fujairah, the Registered Owner's Safety Officer and the Vessel Safety Officer will conduct a voyage routing and will ensure appropriate on board anti-piracy safety procedures, pursuant to ISPS and BMP, and will employ armed guards for the portion of the voyage from Salalah to Muscat.

P.     Prior to the Vessel leaving Salalah, Valero shall be provided with a Certificate of Class issued by Lloyd's Register dated on or after the date that the Lloyd's surveyor completes his inspection of the Vessel at Salalah.

Q.     At Fujairah, prior to and at the conclusion of the STS operation, Koch Shipping and Valero may each appoint one (1) independent inspector/surveyor, jointly with Vessel representatives to measure and sample the oil in the cargo tanks of the Vessel and the replacement vessel and the bunkers in the Vessel's bunker tanks.

R.     Upon Vessel arrival at Fujairah, there will be a joint inspection to determine if the Vessel can safely perform a STS operation to transship the Cargo to the replacement vessel. If Vessel repairs are needed to permit the safe STS operation, the Registered Owner will arrange for such repairs to be done as soon as practicable and the Vessel shall, subject to the terms of the Time Charter, be off-hire for time lost due to such repairs.

S.      If the Vessel is unable to perform safely a STS transfer and is unable to remedy that deficiency within a reasonable time, the parties to this Agreement are at liberty to exercise their full rights under the respective charter party contracts and Bill of Lading. Notwithstanding, the terms of Clause I shall remain in full force and effect.

**General Average**

T.      Prior to the commencement of the STS operation, Koch Shipping will provide General Average security for the sub-freights owed under the Voyage Charter and for the Time Charterer's bunkers to the Registered Owner in the forms annexed as Attachments G , H, I and J.

U.      Prior to the commencement of the STS operation, the Valero Interests will provide General Average security for the Cargo to the Registered Owner in the forms annexed as Attachments K and L.

V.      The STS support expenditures will not be included in the General Average adjustment.

W.      The expenses relating to the post-release hire, the STS transfer and the on carriage by the replacement vessel to the U.S. Gulf will not be included as expenses in General Average and will not be included in the General Average Statement but are incurred by Koch Shipping strictly without prejudice to its right to make a claim for such expenses in the arbitration in New York City with the Registered Owner.

X.      If the STS operation occurs, the Koch Shipping and Valero contributory values for the purpose of the General Average are to be calculated at Fujairah.

Y.      For purposes of General Average, the voyage, as described in the Bill of Lading, will be deemed to be completed at Fujairah and not Galveston.

8

Z.      The Valero Interests will not be liable under the Voyage Charter for any demurrage and/or costs and/or expenses arising out of or in connection with delays at Fujairah. Furthermore, Koch Shipping agrees to defend, indemnify and hold harmless the Valero Interests from all such costs and expenses associated with such delay.

AA.     The non-separation aspect of Rule G of the York Antwerp Rules 2004 is waived by all parties.

## Savings Clause

Notwithstanding any other provision in the Agreement, Koch Shipping and Valero agree that the Valero Interests will not be liable for any Vessel delays or demurrage, loss or contamination of cargo, General Average or related costs and expenses arising out of or in connection with the voyage to Fujairah and the STS operation, including but not limited to all associated activities involving the STS, and Koch Shipping agrees to defend, indemnify and hold the Valero Interests harmless from same, except to the extent caused by Valero or its employees, agents, contractors or representatives.

## Reservation of Rights/Incorporation by Reference

Except for the specific agreements herein of Koch Shipping to defend, indemnify and hold the Valero Interests harmless, this Agreement is without prejudice to any existing or prospective claims or defenses by the parties to this Agreement, including any claims or defenses to be advanced either in New York arbitration or in any other jurisdiction or forum, and is without prejudice to any other rights of the parties to this Agreement.

The terms of the Time Charter, including but not limited to Time Charter Clause 68 providing for arbitration, are incorporated by reference into this Agreement to define, supplement and govern the contractual relationship between the Registered Owner and Koch Shipping as set forth in this

Agreement. The terms of the Voyage Charter are incorporated by reference into this Agreement to define, supplement and govern the contractual relationship between Koch Shipping and Valero. The terms of the Bill of Lading are incorporated by reference in this Agreement to define, supplement and govern the contractual relationship between the Registered Owner and Valero. Notwithstanding the incorporation of the terms of the Bill of Lading, any dispute between Registered Owner and Valero arising out of this Agreement, shall be governed by the general maritime law of the United States and adjudicated in the U.S. District Court for the Southern District of New York which shall be the exclusive jurisdiction for the resolution of any such dispute. If there is a conflict between the terms of the Time Charter, Voyage Charter or the Bill of Lading, as each may apply, the terms of this Agreement are to prevail.

Dated: December 17, 2010
       New York, New York

*SH Tankers Limited*


_____
William J. Honan, Esq.

*Koch Shipping, Inc.*
Cichanowicz Callan Keane Vengrow &
Textor LLP


_____
James M. Textor, Esq.

*On behalf of Valero Marketing & Supply Company*
Bell, Ryniker & Letourneau


_____
Michael K. Bell, Esq.

10

# EXHIBIT 4

**AVERAGE BOND**
**(To be signed by the Receivers of the cargo)**

**To the Owners of the SAMHO DREAM and other parties to the adventure as their interests may appear.**

**Casualty:**          **Seized by pirates on 4 April 2010**

Port of shipment   Basrah                                         Port of destination/discharge   U S  Gulf Coast

Bill of Lading or waybill number(s)   BBL 5635

Quantity and Description of Goods   333,203 439 gross cubic meters Iraq Crude Oil (Basrah Light) in bulk

Invoice Value (attach copy invoice or other evidence of value)   $164,267,056 81

In consideration of the delivery to us or to our order of the goods noted above, without collection of deposit, we agree to pay to the Shipowner or to the duly appointed average adjusters, Richards Hogg Lindley, the proper proportion of any salvage and/or general average and/or special charges which may hereafter be ascertained to be reasonably, legally and properly due from the goods or the shippers or owners thereof reserving all rights under the bill of lading and/or other contract of carriage   We also agree

(a)     to furnish said average adjusters at their request particulars of the value of the goods, supported by a copy of the commercial invoice rendered to us or, if there is no such invoice, details of the shipped value

(b)     to make a payment on account of such sum as   may be reasonably and properly due in respect of the said goods, as soon as same may be duly certified by the average adjusters to be properly payable in respect of the goods and which is legally due in respect of the goods by the shippers or owners thereof

(c)    that this agreement shall be governed by the general maritime law of the United States and any dispute arising out of this agreement shall be adjudicated in the U S  District Court for the Southern District of New York which shall be the exclusive jurisdiction for any such dispute

RECEIVER OF GOODS   Valero Marketing and Supply Company

ADDRESS  P O  Box 696000, San Antonio, TX 78269-0600

TEL NO   78269-0600         FAX NO   210 345-2777      E-MAIL   Ken applegate@valero com

AUTHORISED NAME AND SIGNATURE   _____
                                                                    Ken Applegate, Vice President

DATE  *16  December*
              November 2010

Average Adjusters are        **Richards Hogg Lindley**
                                          88 Leadenhall Street, London EC3A 3BA
                                          Tel  (44) 020 7015 2038, Fax  (44) 020 7015 2091
                                          E-mail  andrew paton@rhl-ctc com

# EXHIBIT 5

DEC - 9 2010

## AVERAGE GUARANTEE

**To the Owners of the SAMHO DREAM and other parties to the adventure as their interest may appear.**

**Casualty:**     **Seized by pirates on 4 April 2010**

In consideration of the delivery in due course of the goods specified below to the consignees thereof without collection of a deposit, we, the undersigned insurers, hereby undertake to pay to the shipowners or to the Average Adjuster, Richards Hogg Lindley, on behalf of the various parties to the adventure as their interests may appear, any contribution to General Average and/or Salvage and/or Special Charges which may hereafter be ascertained to be reasonably, legally and properly due in respect of the said goods reserving all rights under the bill of lading and/or other contract of carriage.

We further agree:

(a) to furnish to the said Average Adjusters at their request all information which is available to us relative to the value and condition of the said goods.

(b) to make a payment on account of such sum as is duly certified by the average adjuster to be properly payable in respect of the goods and which is reasonably, legally and properly due under the bill of lading in respect of the goods identified below from the shippers or owners thereof.

(c) that this agreement shall be governed by the general maritime law of the United States and any dispute arising out of this agreement shall be adjudicated in the U.S. District Court for the Southern District of New York which shall be the exclusive jurisdiction for any such dispute.

| PORT OF LOADING | PORT OF DISCHARGE | BILL OF LADING | QUANTITY & DESCRIPTION OF GOODS | INVOICE VALUE |
|---|---|---|---|---|
| Basrah | U.S. Gulf Coast | BBL/5635 | 330,203.439 gross cubic meters Iraq Crude Oil (Basrah Light) in bulk | $164,267,056.81 |

POLICY/CERTIFICATE NUMBER: SM4-1406
NAME OF INSURER: Southern Marine & Aviation Underwriters, Inc.
NAME & ADDRESS: Southern Marine & Aviation
      13105 Northwest Freeway, Suite 950
      Houston, TX 77040
TEL. NO: (713) 329-8938     FAX NO: (713) 329-9844     Email: andrew.fossler@sma-ins.com

**Southern Marine & Aviation**
**By:** _Andrew Fossler_

AUTHORISED NAME AND SIGNATURE: Andrew M. Fossler/_____
DATE: November 10, 2010

Average Adjusters are:     **Richards Hogg Lindley**
          88 Leadenhall Street, London EC3A 3BA
          Tel: (44) 020 7015 2038, Fax: (44) 020 7015 2091; E-mail: andrew.paton@rhl-ctc.com

# EXHIBIT 6

## A G R E E M E N T

WHEREAS, SH Tankers Limited ("Owner") wishes to appoint Richard Wood ("Mr. Wood"), a Fellow of the Association of Average Adjusters and a Connecticut resident, as the average adjuster in connection with a General Average (GA) which Owner plans to declare,

WHEREAS, the intention is that, if Owner were to appoint Mr. Wood, Richards Hogg Lindley ("RHL") would perform the adjustment in London and/or in Liverpool in accordance with United States law and practice but the GA statement would be issued in New York and signed by Mr. Wood (or if he is unavailable by another average adjuster nominated by RHL),

WHEREAS, the Owner has entered into a time charter dated February 25th, 2010 ("Time Charter") with Koch Shipping Inc. ("Charterer"),

WHEREAS, Clause 37 of the Time Charter provides that the GA is to be adjusted in New York in accordance with United States law and practice, and

WHEREAS, the Owner and Charterer, each has an interest in having the GA adjustment performed by experienced professionals and, therefore, wish to agree that the GA may be adjusted in England.

NOW THEREFORE, the Owner and Charterer, for good and valuable consideration, the receipt of which is hereby acknowledged, agree as follows:

1.      Notwithstanding Clause 37 of the Time Charter, Charterer and Owner each agree that the Time Charter requirement that the GA be adjusted in New York will be satisfied if the GA is adjusted in London and/or Liverpool by RHL according to United States law and practice.

2.      After the issuance of the GA statement, the Owner is to make Mr. Wood, or whoever else signs the GA statement, available for deposition in New York City, if Charterer properly notices his deposition, at no cost to Charterer.

3.    The GA adjustment performed by RHL in London and/or Liverpool will be fully enforceable, in accordance with its terms as if it had been adjusted in New York.

4.    Nothing contained herein shall prejudice Charterer's right to challenge the findings of the GA adjuster or the GA statement except that neither party may challenge on the basis that the location at which the adjustment has taken place was wrongful.

5.    Any dispute arising out of or relating to this Agreement shall be resolved by the arbitrators currently empanelled in the arbitration to resolve disputes between the Owner and the Charterer arising out of the Time Charter.  If that arbitration has been concluded, any dispute shall be resolved in accordance with Clause 68 of the Time Charter, which provision is incorporated by reference in this Agreement.

IN WITNESS WHEREOF, this Agreement is signed this 22 day of July, 2010 by duly authorized representatives of the Owner and the Charterer.

SH Tankers Limited

By_____
          Attorney-in-Fact

Koch Shipping Inc.

By_____
          Attorney-in-Fact

# 9631358_v1

2

# EXHIBIT 7



## HILL RIVKINS LLP

45 Broadway, Suite 1500, New York, NY 10006-3739
Tel: 212 669-0600    Fax: 212 669-0698/0699
e-mail: thefirm@hillrivkins.com
Website: www.hillrivkins.com

July 23, 2010

<u>Via E-mail: bill.honan@hklaw.com</u>

William J. Honan, Esq.
Holland & Knight
31 W. 52nd Street
New York, NY  10019

> Re:   **M/T SAMHO DREAM**
> Your File No.: 352735-00047
> <u>Our File No.: 30417-RGC</u>

Dear Mr. Honan:

We refer to your two letters dated July 14, 2010 regarding the question of reasonableness of any purported ransom payment and the issue of the GA adjustment, as well as your further letter dated July 20, 2010 regarding the GA adjustment.  We take this opportunity to respond on both issues.

With respect to the potential ransom payment of up to $10 million and your request that cargo interests accept "that the ransom of up to $10 million is reasonable", we are not in a position at this time to comment on the reasonableness of any purported payment.  Neither Valero nor cargo underwriters have had any direct or indirect involvement in the negotiations and have not been apprised of all the facts and circumstances surrounding this issue.  We note, however, that a potential payment of up to $10 million contradicts the advices provided in the most recent e-mail message dated July 9, 2010 from Stephen Askins to Mark Lloyd in which he advised that the pirates' present demand was $8.5 million and that the goal was to conclude the negotiations at a figure approximating $7 million.  On this point we request a further update on the negotiations.

As you know, Owners have an obligation to act prudently in the circumstances and cargo interests expect that Owners will take all reasonable steps to ensure the safe and timely release of the cargo, vessel and crew.

NEW JERSEY
102 South Broadway
South Amboy, NJ 08879-1708
Tel: 732 838-0300  Fax: 732 316-2365
e-mail: thefirm@hillrivkins.com

TEXAS
55 Waugh Drive, Suite 1200
Houston, Texas 77007
Tel: 713 222-1515  Fax: 713 222-1359
e-mail: thefirm@hillrivkins.com

CALIFORNIA
Hill Rivkins/Brown & Associates
11140 Fair Oaks Boulevard, Suite 100
Fair Oaks, CA 95628-5126
Tel: 916 535-0263  Fax: 916 535-0268
e-mail: thefirm@brnlaw.com

William J. Honan, Esq.
Holland & Knight
July 23, 2010
<u>Page Two</u>

    With respect to your second letter of the same date as well as your supplemental letter of July 20 regarding the appointment of the GA adjuster, cargo interests have no objection to the appointment of a London adjuster pursuant to the terms you outlined in your July 20 letter so long as the adjustment is performed in accordance with the applicable rules governing GA and all of the terms and conditions of the applicable charter (including, but not limited to, any GA dispute to be litigated/arbitrated in New York) and that the GA adjuster agrees not only to submit to a deposition in any subsequent litigation or arbitration proceeding but will also voluntarily appear at an arbitration hearing, if required, at his or her (or Owners') own expense.

    We trust that the foregoing satisfactorily responds to your correspondence. Should you wish to discuss the matter, please do not hesitate to contact the undersigned.

        Very truly yours,

        HILL RIVKINS LLP

        Robert G. Clyne

RGC/mc
30417\006Honan

Cc:   **Via E-Mail: <u>mkbell@brlpc.com</u>**
      Michael K. Bell, Esq.
      Bell Ryniker & Letourneau
      5847 San Felipe Ste 4600
      Houston, Texas  77057-3261



# EXHIBIT 8

# Richards Hogg Lindley

Average Adjusters and Marine Claims Consultants

## ADJUSTMENT
(Dated 30 September 2014)

**VESSEL:**     **"SAMHO DREAM"**
(Crude oil tanker of 161,135 GT. Built 2002.)

**CASUALTY:**     4 April 2010 - Seizure by pirates in the Arabian Sea off the coast of Oman.

**VOYAGE:**     From Basrah (Iraq) to Galveston (USA) with a cargo of 330,203.439 m.t. of crude oil. Voyage terminated by agreement at Fujairah, UAE.

| **INSURANCES:** | Interest | : | War risks. |
|---|---|---|---|
| | On | : | Hull, Materials, Equipment etc and everything connected therewith, nothing excluded. |
| | Agreed value and amount insured | : | US$162,880,000 |
| | Period | : | 21 September 2009 – 21 September 2010. |
| | Conditions and deductible | : | Institute War Risks and Strikes Clauses Hulls – Time 1/10/83. Including piracy and violent theft, piracy being subject to the H&M deductible of US$300,000. |
| | Warranties | : | IACS classed and maintained. Warranted neither logging nor sand carrying. |

**CASUALTY SUMMARY:**     On 4 April 2010 the vessel was seized by pirates off the coast of Oman and was held until 6 November when it was released following payment of a ransom. Immediately following release, the vessel proceeded to Salalah, Oman as a port of refuge. After taking bunkers and making a crew change, the vessel proceeded to Fujairah where all parties had agreed that the common maritime adventure would be terminated and the cargo should be transhipped and forwarded to destination on another vessel ("Gemini Glory"). The transhipment operation was completed on 13 January 2011, following which the "Samho Dream" proceeded to Dubai for permanent repairs in drydock which were completed around 14 February.

**ADJUSTMENT SUMMARY:**     Claim for general average per York-Antwerp Rules 2004. Claim comprises principally the ransom payment and associated expenses and the costs of calling at both ports of refuge, Salalah and Fujairah.

    Claim for particular average in respect of the cost of permanent repairs effected at Dubai in January / February 2011. The war risks policy of insurance provides cover for loss or damage caused by piracy.

**CLAIMS:**     **General Average**

| | |
|---|---|
| Contributed to by all interests | US$11,318,280.03 |
| Contributed to by all interests except cargo | 156,655.34 |
| | US$11,474,935.37 |

**Particular Average**

| | |
|---|---|
| Gross claim on war risks policy of insurance | US$   177,346.25 |

**A.M. Paton**
**Fellow of the Association of Average Adjusters**
**Director**

**Richards Hogg Lindley**
88 Leadenhall Street
London
EC3A 3BA

T +44 20 7623 1819
F +44 20 7015 2091
E info-london@rhl-ct.com
www.rhlg.com

Richards Hogg Lindley is a trading name of Charles Taylor Adjusting Limited
Registered office  Standard House, 12-13 Essex Street  WC2R 3AA  Registered in England No 1994696



# ADJUSTMENT OF CLAIM

## CONTENTS

**Page(s)**

| | | |
|---|---|---|
| 1) | DOCUMENTS IN SUPPORT OF THE CLAIM | 3 |
| 2) | SUMMARY OF FACTS. | 3 |
| 3) | GENERAL AVERAGE. | 4 |
| | a) Contracts of carriage. | 4 |
| | b) Basis of claim for general average. | 6 |
| | c) General average security. | 8 |
| | d) Allowances in general average and format of the Adjustment. | 9 |
| | e) Contributory values. | 10 |
| | f) Apportionment of general average. | 14 |
| 4) | PARTICULAR AVERAGE. | 15 |
| | a) Policy of insurance. | 15 |
| | b) Policy warranties. | 15 |
| | c) Cause of damage/policy liability. | 16 |
| | d) Permanent repairs at Dubai. | 16 |
| | e) Quantum of claim. | 18 |
| 5) | PAYMENT OF INVOICES. | 18 |
| 6) | CONSULTING SURVEYOR. | 18 |
| 7) | ADDITIONAL CLAIM ON WAR RISKS UNDERWRITERS. | 18 |
| 8) | RECOVERY. | 18 |
| 9) | APPLICATION OF THE CLAIM TO THE WAR RISKS POLICY OF INSURANCE. | 19 |
| 10) | SETTLEMENT TO BE MADE BY CARGO INTERESTS. | 19 |
| 11) | SETTLEMENT TO BE MADE BY TIME CHARTERERS (BUNKERS). | 20 |
| 12) | SETTLEMENT TO BE MADE BY TIME CHARTERERS (FREIGHT AT RISK). | 20 |
| 13) | FINANCIAL BALANCE. | 20 |



# ADJUSTMENT OF CLAIM

**1)** **DOCUMENTS IN SUPPORT OF THE CLAIM.**

We have sighted the following documents which have been taken into consideration in the preparation of this adjustment of claim:

War Risks Policy of Insurance.

- Hull - War & Strike policy of insurance no 90901084960000 dated 21 September 2009.

Contracts of Affreightment.

- Shelltime 4 Time Charter Party dated New York, February 25th 2010 between SH Tankers Limited and Koch Shipping Inc.

- Exxonmobilvoy 2005 Voyage Charter Party dated 8 March 2010 between Koch Shippping Inc (disponent owner) and Valero Marketing and Supply Company.

- SOMO Basrah Oil Terminal Bill of Lading dated 28 March 2010.

Special Agreements.

- Agreement dated 22 July 2010 between owners and time charterers regarding the place of the General Average Adjustment.

- Agreement for STS Operation and Release of the m/v "Samho Dream" dated 17 December 2010 between owners, time charterers and voyage charterers.

War Risks Underwriters' Surveyors.

- SCUA Middle East, Dubai preliminary survey advice reference D/09/2011 dated 6 February 2011.

Ship Valuation.

- English White Shipping Limited Ship Valuation dated 18 February 2011.

Copies of certain of these documents are appended under Appendix A.  We have prepared this adjustment to be read in conjunction with this documentation.  We have quoted and referred to these various documents as necessary in the adjustment.

**2)** **SUMMARY OF FACTS.**

The vessel departed Basrah, Iraq on 28 March 2010 with a cargo of 330,203.439 m.t. crude oil bound for discharge at Galveston, USA. The vessel called at Fujairah on 31 March in order to load bunkers and departed the same day.

On 4 April, whilst proceeding through the Arabian Sea off the coast of Oman, pirates boarded and seized the vessel, holding the crew hostage and demanding that the shipowners make a very large payment by way of ransom for its release. The vessel was held by the pirates pending the outcome of protracted negotiations between the negotiators representing ship interests and the pirates with regard to the amount of the ransom.

Eventually, a ransom payment was agreed and paid and the vessel was released by the pirates on 6 November.



# ADJUSTMENT OF CLAIM

2)  **SUMMARY OF FACTS.**  (Continued)

Following release from seizure by the pirates, the vessel proceeded to Salalah, Oman as a port of refuge where it arrived on 10 November to take on board bunkers and to make a crew change. During the passage to Salalah, the vessel experienced high cooling water temperatures and a restriction of flow and a drop in pressure within the sea water cooling system.

An underwater inspection was carried out by divers at Salalah during which the underwater area was found to be heavily fouled as a result of the extended detention period at sea during the piracy seizure. Due to the expiry of a number of the vessel's class certificates, certain certificates had to be attended to by the vessel's classification society which also issued a condition of class permitting the passage of the vessel from Salalah to Fujairah, UAE.  It had been agreed on 17 December by all the concerned parties (owners, time charterers and the voyage charterers) that at Fujairah a transhipment of the cargo would be made into another vessel for forwarding to destination.  The voyage would thereby terminate at Fujairah.  Thereafter the vessel would proceed directly to Dubai to effect repairs to the hull coating and machinery.

Since it was considered that there was an additional risk to the vessel of seizure by a different group of pirates during the passage from Salalah to Fujairah, a vessel and special security personnel were deployed in order to escort the "Samho Dream" which arrived at Fujairah on 29 December and anchored the same day.

The transhipment of the cargo to the "Gemini Glory" duly took place at anchorage at Fujairah.  Operations commenced on 9 January 2011 and were completed on 13 January (the date on which the voyage was thereby terminated).

After the transhipment operation, the vessel proceeded to Dubai for drydocking in order to effect permanent repairs. This was an unscheduled drydocking in order for repairs to the hull paints and machinery damaged and/or in a poor condition as a consequence of the long detention arising from the piracy seizure.

The vessel anchored at Dubai on 25 January and docked at Drydocks World on 31 January.  Repairs commenced on 1 February. The vessel required a second docking in order to reposition the support blocks for access to the fouled bottom areas of the vessel's hull.  Repairs to the vessel's hull coating and machinery were completed around 14 February.

War risk underwriters' surveyors, SCUA Middle East, Dubai, attended at Dubai during the damage repairs.  Reference is made to their preliminary advice copied in Appendix A which details the extent of the damages found to the hull exterior, the sea water pipe lines, the main condenser, the main engine, the port and starboard boilers and auxiliary diesel generators and the recommended works to be effected.

The cargo was duly delivered and discharged by the "Gemini Glory" in the US Gulf at LOOP and offshore Galveston.

3)  **GENERAL AVERAGE.**

a)  **Contracts of carriage.**

At the time of the casualty the vessel was operating under a time charter party between SH Tankers Ltd (owners) and Koch Shipping Inc (time charterers) dated 25 February 2010.  Clause 37 of the charter party provided:

4



# ADJUSTMENT OF CLAIM

3)   **GENERAL AVERAGE.** (Continued)

a)   **Contracts of carriage.** (Continued)

> *"General Average contributions shall be payable according to the York/Antwerp Rules, 1990 and 1994 as amended and shall be adjusted in New York in accordance with United States law and practice….."*

The voyage charter party dated 8 March 2010 between the time charterers and Valero Marketing and Supply Company provided:

> *"General average shall be adjusted, stated and settled according to the York-Antwerp Rules 2004 and where matters are not provided for in the Rules, according to the laws and usages in the port of New York…..If a General Average statement is required, it shall be prepared at such port by an Adjuster from the port of New York appointed by the Carrier and approved by Charterer of Vessel."*

We have seen a copy of the front side of bill of lading no. BBL/5635 dated 28 March 2010 signed by the Master under which the cargo of 330,203.439 m.t. of crude oil was shipped (we are advised by the cargo interests' lawyers that there are no terms and conditions on the reverse side). There was no reference or provisions in respect of general average on the front side of the bill of lading, but it did provide:

> *"…..all conditions and exceptions of which charter party…..are deemed to be incorporated in this Bill of Lading."*

Since this was an owners' bill of lading, we consider that its contractual terms represent the contract of carriage between owners and the cargo interests, including the terms regarding the adjustment of general average.  Accordingly, this adjustment has been prepared in accordance with the York-Antwerp Rules 2004.

With regard to the place at which the General Average Adjustment was to be prepared, the time charter party provided for New York with the voyage charter party in agreement.  In this respect, subsequently the owners and time charterers agreed on 22 July 2010 that the Adjustment could be prepared by Richards Hogg Lindley (RHL) in the UK in either their London or Liverpool offices.  A copy of this special agreement is shown in Appendix A.

Previously, lawyers representing the owners had written on 20 July 2010 to the cargo interests' lawyers seeking their agreement to this proposal. The latter responded on 23 July 2010 as follows:

> *"……cargo interests have no objection to the appointment of a London adjuster pursuant to the terms you outlined in your July 20 letter so long as the adjustment is performed in accordance with the applicable rules governing GA and all of the terms and conditions of the applicable charter (including, but not limited to, any GA dispute to be litigated/arbitrated in New York) and that the GA adjuster agrees not only to submit to a deposition in any subsequent litigation or arbitration proceeding but will also voluntarily appear at an arbitration hearing, if required, at his or her (or Owners') own expense."*

The General Average Adjustment has been prepared by RHL in London accordingly.



# ADJUSTMENT OF CLAIM

3)   **GENERAL AVERAGE.** (Continued)

    b)   **Basis of claim for general average.**

        i)   <u>Ransom and associated expenditure.</u>

The vessel and cargo were in a position of peril as a consequence of the seizure of the vessel by the pirates. The payment of the ransom and associated costs (including negotiators' fees, delivery charges, cash in transit insurance and legal fees and expenses) were voluntarily and intentionally incurred for the common safety of ship and cargo in order to secure the release of the vessel from seizure by the pirates.  In this respect Rules A and C 1) of the York-Antwerp Rules 2004 provide respectively:

> *"There is a general average act when, and only when, any extraordinary sacrifice or expenditure is intentionally and reasonably made or incurred for the common safety for the purpose of preserving from peril the property involved in a common maritime adventure."*

> *"Only such losses, damages or expenses which are the direct consequence of the general average act shall be allowed as general average."*

In this case the negotiation of the ransom and its subsequent payment was the general average act.

        ii)   <u>Port of refuge and detention expenses.</u>

The costs incurred for the calls at the ports of refuge (Salalah and Fujairah) are allowable to the claim for general average in terms of Rules X and XI of the York-Antwerp Rules 2004 on the basis that, notwithstanding the ransom payment and subsequent release of the vessel, the property interests at risk were not considered to have been entirely free from peril and in a position of common safety. This was due to the mental and physical state of the crew and the condition of the vessel (the shortage of bunkers, the lack of maintenance work during the seizure thereby causing problems with the main engine and auxiliary engines and the heavy fouling of the vessel's hull).  Further, in view of the increased risk of another possible piracy attack due to the condition of the crew and the vessel, it was considered necessary for an escort vessel and security personnel to accompany the vessel on the passage from Salalah to Fujairah. Accordingly, we are of the opinion that the vessel and cargo were still in the 'grip of the peril' at the time of the vessel's release and subsequently thereafter until completion of the discharge of cargo.  On this basis we have allowed in general average the port charges incurred at Salalah and Fujairah.

The costs of proceeding to the ports of refuge (Salalah and Fujairah), comprising fuel and stores and crew wages and maintenance and the port charges and detention expenses incurred during the periods whilst the vessel was detained at Salalah and Fujairah) would in principle be allowed to general average in terms of Rules X and XI up to the date of completion of transfer of cargo from the "Samho Dream" to the "Gemini Glory" when the voyage was terminated.



# ADJUSTMENT OF CLAIM

3)   **GENERAL AVERAGE.** (Continued)

   b)   **Basis of claim for general average.** (Continued)

      ii)   Port of refuge and detention expenses. (Continued)

However, section D of the special Agreement dated 17 December 2010 between owners, time charterers and voyage charterers (copied in Appendix A) provided that the time charterers would continue to pay hire to the owners 'until such time as the hoses are disconnected at the completion of the STS operation at Fujairah'.

Accordingly, since the vessel was not placed off-hire by the time charterers and the owners were continuing to earn hire, we do not consider it equitable that the owners should be able to claim for crew wages and maintenance and ship's stores in respect of the prolongation of the voyage occasioned by the calls into the two ports of refuge and the period of detention at these ports.  The reason for this view is that the wages and maintenance and ship's stores are regarded as constituent parts of the hire.

Further, bearing in mind the terms of the special agreement, we do not consider that in such circumstances the time charterers may claim in general average for the bunkers consumed at their cost during these periods.  In any event, no claim for the consumption of bunkers has been submitted by time charterers to Adjusters in compliance with the burden of proof placed on them by Rule E of the York-Antwerp Rules 2004.

      iii)   Special Agreement with Time Charterers and Concerned in Cargo

The special Agreement dated 17 December 2010 provided specifically:

*"Savings Clause*

*Notwithstanding any other provision in the Agreement, Koch Shipping and Valero agree that the* <u>*Valero Interests will not be liable for*</u> *any Vessel delays or demurrage, loss or contamination of cargo,* <u>*General Average*</u> *or related costs and expenses* <u>*arising out of or in connection with the voyage to Fujairah and the STS operation,*</u> *including but not limited to all associated activities involving the STS, and Koch Shipping agrees to defend, indemnify and hold the Valero Interests harmless from same, except to the extent caused by Valero or its employees, agents, contractors or representatives."*

(our underlining)

Accordingly, in view of the underlined provision, we have interpreted the Agreement to mean that the contribution to general average by the cargo (being 'the Valero Interests') should cease upon departure of the vessel from Salalah.  The adjustment has been stated accordingly.  Further explanation is provided under Note 3) d) below.



**RICHARDS HOGG LINDLEY**
Average Adjusters and Marine Claims Consultants

# ADJUSTMENT OF CLAIM

3)   **GENERAL AVERAGE.**  (Continued)

    b)   **Basis of claim for general average.**  (Continued)

        iv)   STS and forwarding of cargo to destination.

            The costs of the STS operation and the on-carriage of the cargo by the replacement vessel were incurred by the time charterers in terms of the special Agreement dated 17 December 2010.  These costs were agreed by the concerned parties not to be allowed in general average in any event.  The Agreement provided in this respect:

                *"General Average*

                *V.   The STS support expenditures will not be included in the General Average adjustment.*

                *W.   The expenses relating to the post-release hire, the STS transfer and the on carriage by the replacement vessel to the U.S. Gulf will not be included as expenses in General Average and will not be included in the General Average Statement but are incurred by Koch Shipping strictly without prejudice to its right to make a claim for such expenses in the arbitration in New York City with the Registered Owner.*

                *AA.   The non-separation aspect of Rule G of the York-Antwerp Rules 2004 is waived by all parties."*

    The claim for general average has been stated on such basis.

    c)   **General average security.**

    A completed and signed average bond and average guarantee were provided by the cargo receivers and insurers respectively subject to the provision:

        *"This agreement shall be governed by the general maritime law of the United States and any dispute arising out of this agreement shall be adjudicated in the U.S. District Court for the Southern District of New York which shall be the exclusive jurisdiction for any such dispute."*

    A copy of the commercial invoice for the cargo was also provided.

    Completed and signed average bonds and average guarantees were provided also by Koch Shipping Inc and Koch Shipping Resources Inc respectively in respect of time charterers' freight at risk and bunkers, both capped at US$1,000,000 and subject to the provision:

        *"This agreement shall be governed by the law and arbitration provisions of clause 68 of the time charter party dated New York 25 February 2010."*

    A copy of the invoice in respect of the time charterers' freight was also provided.



# ADJUSTMENT OF CLAIM

**3)**  **GENERAL AVERAGE.**  (Continued)

    **d)**  **Allowances in general average and format of the Adjustment.**

The principal allowances in general average consist of the following:

    **i)**  <u>Payment of the ransom.</u>

As stated in Note 3) b), the payment of the ransom was clearly made for the common safety of ship and cargo. In the event, the vessel was released by a ransom payment of <u>US$9,361,700</u>.

Following the seizure of the vessel, the war risks underwriters and owners instructed London lawyers, Ince & Co, to handle the negotiations with the pirates and to agree a ransom settlement in order to secure the release of the vessel and cargo.  Underwriters and owners also appointed specialist negotiators who had much previous experience of negotiating with Somali pirates in similar incidents. The underwriters and owners agreed with the proposed figure for settlement of the ransom after careful consideration of the recommendations made by the lawyers and negotiators.

Bearing in mind the above, the payment of the ransom at <u>US$9,361,700</u> is allowable in general average in terms of Rule A of the York-Antwerp Rules 2004 as a reasonably incurred expense.

    **ii)**  <u>Associated expenses relating to the payment of the ransom.</u>

In addition to the payment of the ransom itself, war risks underwriters and owners incurred considerable expenses consisting of:

- The negotiators' fees and expenses.

- The drop charges (being the costs relating to the physical delivery of the ransom payment to the pirates in the form of cash).

- Cash in transit insurance.

- Legal fees and expenses.

All these expenses were incurred as a direct consequence of the general average act and accordingly are allowed in general average in terms of Rules A and C of the York-Antwerp Rules 2004.

    **iii)**  <u>Port charges calling at the ports of refuge (Salalah and Fujairah).</u>

With reference to Note 3) b) ii), the port charges in respect of entering Salalah and Fujairah and the periods of detention at these ports are allowable in the claim for general average in terms of Rules X and XI (a) of the York-Antwerp Rules 2004. Included in the costs of the call at Fujairah are the escort vessel and security personnel.

As explained in the same Note, no allowances have been made to general average in respect of the wages and maintenance of the Master, officers and crew incurred and the fuel and stores consumed.

    **iv)**  <u>Miscellaneous items.</u>

Interest (per Rule XXI of the York-Antwerp Rules 2004), the owners' communications costs and adjusters' charges are allowed to general average.



# ADJUSTMENT OF CLAIM

**3)**    **GENERAL AVERAGE.** (Continued)

     **d)**    **Allowances in general average and format of the Adjustment.** (Continued)

         The details of the claimed expenses and the allowances to the claim for general average are shown in Appendix B.

         With reference to the cargo contributing to the general average only up to departure from Salalah as mentioned in Note 3) b) ii) above, the claim for general average has been stated in the Adjustment on the following basis:

| General Average | |
| --- | --- |
| All interests | All interests except cargo |
| Ransom payment and associated expenses and the costs of the call at Salalah. | The costs of the escort vessel and security personnel on the passage from Salalah to Fujairah and the costs of the call at Fujairah. |

     **e)**    **Contributory values.**

         So far as the York-Antwerp Rules are concerned with regard to the contributory values, Rule G1) of the York-Antwerp Rules 2004 provides:

         *"General average shall be adjusted as regards both loss and contribution upon the basis of values at the time and place when and where the adventure ends."*

         Further, Rule XVII 'Contributory Values' provides:

         *"(a)(i)  The contribution to a general average shall be made upon the actual net values of the property at the termination of the adventure except that the value of cargo shall be the value at the time of discharge, ascertained from the commercial invoice rendered to the receiver or if there is no such invoice from the shipped value.*

         *(ii)  The value of the cargo shall include the cost of insurance and freight unless and insofar as such freight is at the risk of interests other than the cargo, deducting therefrom any loss or damage suffered by the cargo prior to or at the time of discharge.*

         *(iii)  The value of the ship shall be assessed without taking into account the beneficial or detrimental effect of any demise or time charterparty to which the ship may be committed.*

         *(b)  To these values shall be added the amount allowed as general average for property sacrificed, if not already included, deduction being made from the freight and passage money at risk of such charges and crew's wages as would not have been incurred in earning the freight had the ship and cargo been totally lost at the date of the general average act and have not been allowed as general average; deduction being also made from the value of the property of all extra charges incurred in respect thereof subsequently to the general average act, except such charges as are allowed in general average or fall upon the ship by virtue of an award for special compensation under Art. 14 of the International Convention on Salvage, 1989 or under any other provision similar in substance.*



# ADJUSTMENT OF CLAIM

**3)**    **GENERAL AVERAGE.** (Continued)

     **e)**    **Contributory values.** (Continued)

         *(c)  In the circumstances envisaged in the third paragraph of Rule G, the cargo and other property shall contribute on the basis of its value upon delivery at original destination unless sold or otherwise disposed of short of that destination, and the ship shall contribute upon its actual net value at the time of completion of discharge of cargo."*

         Under the special Agreement dated 17 December 2010 the owners, time charterers and voyage charterers agreed the following in relation to the contributory values of time charterer's freight at risk and bunkers and the cargo:

         *"General Average*

         *X. If the STS operation occurs, the Koch Shipping and Valero contributory values for the purpose of the General Average are to be calculated at Fujairah.*

         *Y. For the purposes of General Average the voyage, as described in the Bill of Lading, will be deemed to be completed at Fujairah and not Galveston."*

         Taking into consideration these provisions, the contributory values of the contributing interests (ship, cargo, bunkers and freight at risk) have been assessed as follows:

         **i)**    <u>Ship</u>.

         We have obtained a sound market valuation of the vessel from specialist ship valuers, English White Shipping Limited, as at the last date of discharge of cargo at Fujairah on 13 January 2011 in the amount of <u>US$65,000,000</u>.  A copy of the valuation certificate is shown in Appendix A.

         The loss or damage to the vessel caused directly by the pirates and also as a consequence of the long period of seizure forms a deduction from the sound market value in order to calculate the net contributory value of the vessel. In their preliminary advice, copied below in Appendix A, the war risks underwriters' surveyors estimated that "permanent repair costs will be in the region of <u>US$650,000</u> excluding dry docking and general services." In the absence of the shiprepair yard's invoice (see Note 7) v)), we have adopted this estimated figure for the purposes of calculating the net contributory value.

         The net contributory value of the vessel is therefore assessed to be:

| | |
|---|---:|
| Sound market value | US$65,000,000 |
| <u>Less</u>: damage | 650,000 |
| Net contributory value | US$64,350,000 |



# ADJUSTMENT OF CLAIM

3)   **GENERAL AVERAGE.**  (Continued)

    e)   **Contributory values.**  (Continued)

        ii)   <u>Cargo</u>.

The FOB value of 330,203.439 m.t. crude oil was <u>US$164,267,056.81</u> in accordance with the commercial invoice no. B/96/2010 rendered to the receivers. To his FOB value we have added the estimated insurance premium for the cargo in the amount of <u>US$41,066.76</u>, which figure has been agreed by the parties concerned. We are not advised of any loss or damage to the cargo after completion of discharge at Fujairah.

Accordingly, the net contributory value of cargo has been assessed to be the sum of <u>US$164,308,123.57</u> or <u>US$164,308,124</u>.

        iii)   <u>Time charterers' bunkers</u>.

In principle, the calculation of the contributory value of the bunkers is based upon the quantities/values remaining on board the vessel on completion of discharge of cargo at Fujairah on 13 January 2011, less the amounts taken on board at Salalah in November 20101, after the release of the vessel (the general average act), and adding back amounts, if any, allowed in general average as 'made good'.

The survey of bunkers held on 13 January 2011 recorded the following quantities remaining on board:

- Fuel oil – <u>999.250</u> metric tons

- Diesel oil – <u>45.247</u> metric tons

We have not been provided with details of the quantities of bunkers loaded on board at Salalah in November 2010. Accordingly, we have adopted assumed amounts of <u>250</u> metric tons of Fuel Oil and <u>30</u> metric tons of Diesel Oil. In view of the low contributory value of the time charterers' bunkers relative to the contributory values of the ship and cargo, we have not investigated matters in any greater detail.

Since no amounts have been allowed in general average in respect of the sacrifice of bunkers proceeding to the ports of refuge (no claim was submitted by time charterers in this respect), no amounts are brought back into the calculations as made good.

Accordingly, for the purposes of the General Average adjustment we have calculated the contributory value of the bunkers as being:

| | |
|---|---:|
| Fuel oil <u>749.250</u> metric tons at <u>US$449.00</u> per m.t. | US$336,413.25 |
| Diesel oil <u>15.247</u> metric tons at <u>US$800.00</u> per m.t. | 12,197.60 |
| | US$348,610.85 |
| or | US$348,611 |



# ADJUSTMENT OF CLAIM

3)  **GENERAL AVERAGE.** (Continued)

    e) **Contributory values.** (Continued)

        iv) <u>Time charterers' freight at risk</u>.

        The bill of lading provided that payment of freight was as per charter party. In this respect, the freight was payable to the time charterers by the voyage charterers without discount upon charterers' receipt of notice of completion of discharge of cargo at last discharging place'. Freight was therefore at the risk of the time charterers. We have been provided with the final freight invoice issued by the time charterers to the voyage charterers in respect of the voyage charter freight in the amount of <u>US$5,228,265.31</u>.

        However, time charterers had to pay for the freight of the forwarding vessel "Gemini Glory" to transport the cargo to destination following the STS operation. Accordingly, this sum should be deducted from the contributory value of the freight at risk in accordance with Rule XVII of the York-Antwerp Rules 2004 ("*...deduction being also made from the value of the property of all extra charges incurred in respect thereof subsequently to the general average act, except such charges are allowed in general average...*") We have not been provided with a copy of the freight invoice for the "Gemini Glory", but understand from the relevant charter party that the freight rate was WS37.5 per metric ton. Having made some general enquiries, we have been advised that the appropriate flat rate to adopt for these calculations is about US$30 Fujairah / Galveston on which basis the lump sum freight is calculated at:

        <u>330,203.439</u> m.t. x <u>US$30</u> x <u>37.5%</u>              <u>US$3,714,788.69</u>

        In the absence of any available information, we have not attempted to bring into the calculations the expenses of port charges etc., and demurrage which the time charterers (as the voyage charterers of the "Gemini Glory") may have been required to pay in addition to the lump sum freight in order to arrive at the total cost of forwarding the cargo. In view of the low contributory value of the freight at risk relative to the contributory values of the ship and cargo, we have not investigated matters further.

        Accordingly, for the purposes of the General Average adjustment we have calculated the net contributory value of the freight at risk as being:

| | |
|---|---:|
| Freight at risk ("Samho Dream") | US$5,228,265.31 |
| Less: forwarding freight ("Gemini Glory") | 3,714,788.69 |
| Net contributory value | US$1,513,476.62 |
| or | US$1,513,477 |



# ADJUSTMENT OF CLAIM

**3)**   **GENERAL AVERAGE.**  (Continued)

    **f)**   **Apportionment of general average.**

        Based upon the preceding Notes, the claim for general average is apportioned as follows over the contributory interests:

|  | Contributory values |  | General Average (All interests) |
|---|---|---|---|
| Ship | US$64,350,000 | pays in ppn | US$  3,159,511.76 |
| Cargo | 164,308,124 | -"- | 8,067,341.87 |
| Time charterers' bunkers | 348,611 | -"- | 17,116.40 |
| Time charterers' freight at risk | 1,513,477 | -"- | 74,310.00 |
|  | US$230,520,212 | pays in ppn | US$11,318,280.03 |

|  | Contributory values |  | General Average (All interests except cargo) |
|---|---|---|---|
| Ship | US$64,350,000 | pays in ppn | US$43,730.53 |
| Cargo | 164,308,124 | -"- | 111,659.38 |
| Time charterers' bunkers | 348,611 | -"- | 236.91 |
| Time charterers' freight at risk | 1,513,477 | -"- | 1,028.52 |
|  | US$230,520,212 | pays in ppn | US$156,655.34 |



# ADJUSTMENT OF CLAIM

**4)**   **PARTICULAR AVERAGE.**

    **a)**   **Policy of insurance.**

At the time of the casualty on 4 April 2010 the vessel was insured materially as follows:

| | | |
|---|---|---|
| Interest | : | War risks. |
| On | : | Hull, Materials, Equipment etc and everything connected therewith, nothing excluded. |
| Agreed value and amount insured | : | US$162,880,000 |
| Period | : | 21 September 2009 – 21 September 2010. |
| Conditions & deductible | : | Institute War Risks and Strikes Clauses Hulls – Time 1/10/83. Including piracy subject to H&M deductible of US$300,000. |
| Warranties | : | IACS classed and maintained. Warranted neither logging nor sand carrying. |

    **b)**   **Policy warranties.**

The policy of insurance incorporates the following express warranties:

      **i)**   <u>IACS classed and maintained.</u>

The vessel's classification society is Lloyd's Register which is a member of IACS. We have requested a copy of the Lloyd's Register confirmation of class certificate stating the vessel maintained its class from 1 January 2010 (policy inception) until 4 April 2010 (date of incident). However, the parties concerned with the claim on the war risks policy of insurance have been unable to provide a copy of this document. Nevertheless, since war risks underwriters and their reinsurers have made payments under the policy, we have assumed that they were satisfied that there had been due compliance with this policy warranty or, at the very least, had agreed to waive its terms.

.

      **ii)**   <u>Warranted neither logging nor sand carrying.</u>

We understand that during the period from 21 September 2009 to 4 April 2010 the vessel was not engaged in the carriage of either logs or sand. The vessel was carrying crude oil cargo at the time of the casualty.



# ADJUSTMENT OF CLAIM

**4)**  **PARTICULAR AVERAGE.**  (Continued)

**c)**  **Cause of damage/policy liability.**

Loss/damage was caused to the vessel as a direct consequence of its seizure by the pirates and its subsequent detainment.

The hull war and strikes policy of insurance provides coverage for this loss and damage.  The policy schedule states:

*"Subject to the following clauses, endorsements, special conditions and warranties… including piracy subject to HM deductible."*

Clause 1 of the Institute War and Strikes Clauses Hulls – Time 1/10/83 states that the insurance covers loss of or damage caused by:

*"1.2 capture seizure arrest restraint or detainment and the consequences thereof or any attempt thereat."*

Policy liability arises accordingly upon war risks underwriters for the reasonable cost of repairs resulting from the consequences of the seizure and detainment of the vessel by the pirates.

**d)**  **Permanent repairs at Dubai.**

Subsequent to the completion of discharge of cargo at Fujairah, the vessel removed to Dubai for permanent repairs. For a full description of the damages, reference is made to the underwriters' surveyors' report dated 6 February 2011, a copy of which is enclosed at Appendix A. In brief, these damages were as follows:

-  The hull exterior (vertical sides and flat bottom), rudder blade, propeller and sea chest grids, etc., were heavily fouled with marine growth and hard shell encrustations which had accumulated during the detention period whilst the vessel was held by the pirates.

-  Sea water pipe lines and main condenser were similarly affected by marine growth and hard shell encrustations.

-  Three piston crowns were reportedly cracked in the main engine.

-  Failure of the no. 3 auxiliary engine crank pin journal was caused by the restricted cooling water flow through the high temperature cooling system circuit which caused overheating of the lub oil system.



# ADJUSTMENT OF CLAIM

4)    **PARTICULAR AVERAGE.**  (Continued)

    d)    **Permanent repairs at Dubai.**  (Continued)

In summary, the repairs effected during the docking in Dubai were as follows:

- The external hull vertical sides, flat bottom areas, sea chests and rudder plate and propeller were hand scraped in order to remove hard shell encrustations and marine growth.

- Sea water pipe lines dismantled and removed in order to scrape the fouled areas and to enable application of coatings to the pipe system.

- Main engine cylinder heads and piston assemblies removed and sent to workshop for cleaning, inspection and calibration.

- Port and starboard auxiliary boilers opened for inspection and water washing.

- Auxiliary diesel generator dismantled and cylinder heads, piston assemblies and connecting rods removed and transported to workshop for cleaning, inspection and calibration.

- Hull blasted and coated.

**Adjusters' Note.**

Clause 15 of the Institute Time Clauses - Hulls 1/10/83 is incorporated into the war risks policy of insurance by clause 2 of the Institute War and Strikes Clauses 1/10/83 which states as follows:

*"In no case shall a claim be allowed in respect of scraping gritblasting and/or other surface preparation or painting of the vessel's bottom except that:*

*15.1 gritblasting and/or other surface preparation of new bottom plates ashore and supplying and applying any "shop" primer thereto,*

*15.2 gritblasting and/or other surface preparation of: the butts or area of plating immediately adjacent to any renewed or refitted plating damaged during the course of welding and/or repairs, areas of plating damaged during the course of fairing, either in place or ashore,*

*15.3 supplying and applying the first coat of primer/anti-corrosive to those particular areas mentioned in 15.1 and 15.2 above,*

*shall be allowed as part of the reasonable cost of repairs in respect of bottom plating damaged by an insured peril."*

The costs of hull blasting, scraping and coating the hull were incurred as a result of the heavy fouling with marine growth which occurred during the extended period of detention by the vessel during the piracy seizure, which is an insured peril. However, we have disallowed such costs from the claim for particular average in view of the specific bottom painting clause exclusions.



# ADJUSTMENT OF CLAIM

4) **PARTICULAR AVERAGE.** (Continued)

    e)    **Quantum of claim.**

        The details of the claimed expenses and allowances to the claim for particular average are shown in Appendix B.   The total claim for particular average (excluding adjustment charges) amounts to US$167,596.25.

5) **PAYMENT OF INVOICES.**

    Except as where stated, we have seen all the vouchers customarily produced for the disbursements herein and have either seen some documentary evidence indicating payment or we have received, in response to our specific enquiry, advices from the assured that payment has been effected.

6) **CONSULTING SURVEYOR.**

    For technical matters arising in this adjustment we have obtained the advice of Mr. G. Wilson, IENG, IMarEng MIMarEst of Charles Taylor Adjusting Marine.

7) **ADDITIONAL CLAIM ON WAR RISKS UNDERWRITERS.**

    Repairs to the vessel were carried out in drydock at Drydocks World Dubai in January/ February 2011.  Should it be provided, the invoice can be submitted to the underwriters' surveyors for approval and a further additional claim on the war risks policy of insurance may arise accordingly.

8) **RECOVERY.**

    In May 2010 the owners commenced arbitration proceedings against the time charterers in order to pursue a claim for the recovery of their losses in the amount of US$11.8 million arising from the seizure of the vessel by the pirates.  In June the panel of arbitrators stayed the proceedings pending payment of the ransom.  In November, after the ransom had been paid, the stay of the arbitration proceedings was lifted.

    Subsequently, the time charterers made a counter-claim in the amount of US$13.4 million for their own losses.  However, the owners were unable to provide security to the time charterers in respect of their counter-claim because the owners of the vessel had by this time filed for protection from creditors in a bankruptcy court in South Korea in April 2012.  In December 2012 the panel of arbitrators halted the arbitration hearings until the security could be provided to the time charterers.  We understand that owners sought a court ruling in New York in order to overturn the arbitrators' decision, but the court rejected the application.  We understand that there has been no appeal against the court's decision and that there have been no other developments.   In the circumstances, it appears that owners' recovery claim may not be pursued any further.

    However, should owners succeed in obtaining a recovery of all or part of the losses which are the subject to this adjustment, the concerned interests would be entitled to be credited accordingly.



# ADJUSTMENT OF CLAIM

**9)** **APPLICATION OF THE CLAIM TO THE WAR RISKS POLICY OF INSURANCE.**

The claim on war risks underwriters is stated as follows:

**Claim:**

| | |
|---|---:|
| Ship's proportion of general average (All interests) – see Note 3) f) | US$3,159,511.76 |
| Ship's proportion of general average (All interests except cargo) – see Note 3) f) | 43,730.53 |
| (Vessel fully insured for general average contribution.) | |
| | US$3,203,242.29 |
| Particular Average (see Appendix B) | 177,346.25 |
| | US$3,380,588.54 |
| Less: policy deductible (see Note 4) a)) | 300,000.00 |
| | US$3,080,588.54 |

| | | |
|---|---:|---:|
| Credit: payments made by war risks underwriters (see Appendix B) | US$ 9,676,782.18 | |
| general average interest thereon (see Appendix B) | 560,779.60 | |
| adjusters' charges to be paid | 129,500.00 | |
| | US$10,367,061.78 | |
| Less: amount charged to Remainder | 209,602.45 | |
| | | (Cr.) 10,157,459.33 |
| Balance net amount for policy to receive | | (Cr.) US$7,076,870.79 |

**10)** **SETTLEMENT TO BE MADE BY CARGO INTERESTS.**

Pay: (see Note 3) f))

| | |
|---|---:|
| General average contribution (All interests) | US$8,067,341.87 |
| General Average contribution (All interests except cargo) | 111,659.38 |
| Total to pay | US$8,179,001.25 |



# ADJUSTMENT OF CLAIM

**11)   SETTLEMENT TO BE MADE BY TIME CHARTERERS (BUNKERS).**

Pay: (see Note 3) f))

| | |
|---|---|
| General average contribution (All interests) | US$17,116.40 |
| General Average contribution (All interests except cargo) | 236.91 |
| Total to pay | US$17,353.31 |

**12)   SETTLEMENT TO BE MADE BY TIME CHARTERERS (FREIGHT AT RISK).**

Pay: (see Note 3) f))

| | |
|---|---|
| General average contribution (All interests) | US$74,310.00 |
| General Average contribution (All interests except cargo) | 1,028.52 |
| Total to pay | US$75,338.52 |

**13)   FINANCIAL BALANCE.**

**A)   PARTIES TO RECEIVE FUNDS:**

**Adjusters' Note.**

In respect of item 1, the figures under section A) (unless stated otherwise) can be found in the "Summary of Disbursements" section in Appendix B.

**1.   Shipowners:**

Receive credit for:

| | |
|---|---|
| Ransom payment and related disbursements incurred (including general average interest) | US$1,189,538.10 |
| Disbursements incurred at Salalah, Oman (including general average interest) | 141,904.82 |
| Disbursements incurred at Fujairah | 134,489.06 |
| Disbursements incurred at Dubai | 537,723.26 |
| | US$2,003,655.24 |

Less:

| | | |
|---|---|---|
| War risks policy deductible (See Note 9) above | US$300,000.00 | |
| Amounts to Remainder | 508,832.95 | |
| | | 808,832.95 |
| Balance to receive | | US$1,194,822.29 |
| | | (Carried forward) |



## ADJUSTMENT OF CLAIM

**13)   FINANCIAL BALANCE.**  (Continued)

|  |  | (Brought forward) | US$1,194,822.29 |
|---|---|---|---|
| **2.** | **War risks underwriters:** | | |
| | Amount to receive as per Note 9) above | | 7,076,870.79 |
| | | | US$8,271,693.08 |

**B)   PARTIES TO PAY FUNDS**

| | | |
|---|---|---|
| **1.  Cargo interests** (see Note 10) above | US$8,179,001.25 | |
| **2.  Time charterers (bunkers)** (See Note 11) above | 17,353.31 | |
| **3.  Time charterers (freight at risk)** (see Note 12) above | 75,338.52 | |
| | US$8,271,693.08 | |

**RICHARDS HOGG LINDLEY**
**30 September 2014**



**88 Leadenhall Street**
**London EC3A 3BA**

**A.M. Paton**
**Director - Marine Claims**

# EXHIBIT 9

**Barlotta, Lynn (NYC - X73301)**

| | |
|---|---|
| **From:** | James Willan <James.Willan@ctplc.com> |
| **Sent:** | Friday, October 03, 2014 9:43 AM |
| **To:** | jsaville@hillrivkins.com |
| **Cc:** | Honan, Bill (NYC - X73300); apruzinsky@hillrivkins.com; Daly, Blythe (NYC - X73570); Andrew Paton |
| **Subject:** | Samho Dream - GA Adjustment |
| **Attachments:** | SAMHO DREAM - Final Adjustment of Claim.pdf |

Dear Mr Saville,

With reference to the above, we are pleased to advise that the General Average adjustment has now been issued (please see attached) and the final amounts to be paid in General Average are now known.

Note 10) of the adjustment detail the settlements to be made by cargo interests as <u>US$ 8,179,001.25</u>.

Please can you arrange payment of cargos' General Average contribution amounting to <u>USD 8,179,001.25</u> to our clients' trust bank account:-

| | | |
|---|---|---|
| Natwest Bank Plc | IBAN: | GB73 NWBK 6073 0127 0357 94 |
| 116 Fenchurch Street | Swift: | NWBKGB2L |
| London | Sort Code: | 56-00-18 |
| EC3M 5AN | US$ Account no. | 140 00 27035794 |
| U.K. | Credit of: | CTC plc – Liverpool Client A/C |
| Natwest Bank Plc | Reference: | SAMHO DREAM – CARGO GA CONTRIBUTION |

For your guidance, we have also sent the adjustment to counsel representing Valero (Mr Michael K. Bell, Blank Rome LLP).

Thank you for your assistance in this matter. We look forward to hearing from you with regard to settlement of this amount, but in the meantime we should be grateful if you would acknowledge receipt of this message and the adjustment.

Kind regards,
**James Willan**
**Average Adjuster**

**Richards Hogg Lindley**
4th Floor, Royal Liver Building  Pier Head, Liverpool Waterfront  Liverpool L3 1JH  UK
T +44 151 227 2175
Dir Tel +44 151 235 5579
E-mail  James.Willan@ctplc.com
Website  www.rhlg.com


Charles Taylor Adjusting Limited is registered in England (Company No 1994696)  Registered office  Standard House  12-13 Essex Street, London WC2R 3AA  VAT Registration No  GB577566485

Unless otherwise agreed in writing, all assignments/matters are accepted on our standard terms and conditions of business, which are available at www.ctplc.com/adjusting together with full details of the services we offer  Our liability in connection with this matter is limited to the lesser of £1m or ten times the value of our fees or such other amount as has been agreed in writing

This email (including all attachments) is confidential and may be protected by legal privilege  If you are not the intended recipient, you must not copy it, re-transmit it, use it or disclose its contents to anyone else  If you have received it in error, please notify the sender immediately and delete your copy from your system  We monitor emails sent to or from our network for viruses and unauthorised use we recommend that you should also check messages for viruses in accordance with good computing practice  Emails sent to or from our systems are not confidential to any named individual and we reserve the right to read them without prior notice

**Barlotta, Lynn (NYC - X73301)**

| | |
|---|---|
| **From:** | James Willan <James.Willan@ctplc.com> |
| **Sent:** | Friday, October 03, 2014 9:45 AM |
| **To:** | mbell@blankrome.com |
| **Cc:** | Honan, Bill (NYC - X73300); Daly, Blythe (NYC - X73570); Andrew Paton |
| **Subject:** | Samho Dream - GA Adjustment |
| **Attachments:** | SAMHO DREAM - Final Adjustment of Claim.pdf |

Dear Mr Bell,

With reference to the subject-matter, we are pleased to advise that the General Average adjustment has now been issued and we attach a copy for your reference.

Note 10) of the adjustment details the settlement to be made by Cargo interests as US$ 8,179,001.25.

In respect to cargo's general average contribution we have also sent a message to the counsel representing cargo insurers (Mr James A. Saville, Jr., Hill Rivkins & Hayden L.L.P) and provided them with the relevant clients' trust bank account details to which they should make remittance of the aforementioned funds.

We should be grateful if you would acknowledge receipt of this message and the adjustment.

Kind regards,
**James Willan**
**Average Adjuster**

**Richards Hogg Lindley**
4th Floor, Royal Liver Building  Pier Head  Liverpool Waterfront  Liverpool L3 1JH  UK
T  +44 151 227 2175
Dir Tel  +44 151 235 5579
E-mail  James.Willan@ctplc.com
Website  www.rhlg.com

Charles Taylor Adjusting Limited is registered in England (Company No 1994696)  Registered office  Standard House, 12-13 Essex Street, London WC2R 3AA  VAT Registration No  GB577566485

Unless otherwise agreed in writing, all assignments/matters are accepted on our standard terms and conditions of business, which are available at www.ctplc.com/adjusting together with full details of the services we offer  Our liability in connection with this matter is limited to the lesser of £1m or ten times the value of our fees or such other amount as has been agreed in writing

This email (including all attachments) is confidential and may be protected by legal privilege  If you are not the intended recipient  you must not copy it, re-transmit it, use it or disclose its contents to anyone else  If you have received it in error, please notify the sender immediately and delete your copy from your system  We monitor emails sent to or from our network for viruses and unauthorised use we recommend that you should also check messages for viruses in accordance with good computing practice  Emails sent to or from our systems are not confidential to any named individual and we reserve the right to read them without prior notice